UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CATRINA HOOPER,                          Case No. 17-CV-3442 (PJS/DTS)

                Plaintiff,

v.                                                    ORDER

CITY OF ST. PAUL,

                Defendant.

Roderick J. Macpherson, III, MN DISABILITY LAW CENTER, for plaintiff.

Cheri M. Sisk and Anthony G. Edwards, SAINT PAUL CITY
ATTORNEY'S OFFICE, for defendant.

Plaintiff Catrina Hooper is a deaf woman who got into a fight with her mother,

Sandra Hooper.  As a result of the fight, Catrina had a series of interactions with the

St. Paul Police Department ("SPPD"), during which the SPPD communicated with her

in various ways, but did not use a certified American Sign Language ("ASL")

interpreter.  Catrina brought this action against defendant the City of St. Paul

("St. Paul" or "City"), alleging that, by failing to effectively communicate with her,

St. Paul violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; the

Rehabilitation Act ("RA"), 29 U.S.C. § 794; the Minnesota Human Rights Act

("MHRA"), Minn. Stat. § 363A.12, subd. 1; and Minn. Stat. § 611.32, subd. 2 (which

requires an arresting officer to obtain a "qualified interpreter" immediately after arresting "a person disabled in communication").

St. Paul now moves for summary judgment on all claims. For the reasons that follow, the Court grants St. Paul's motion in (large) part and denies its motion in (small) part.

## I. BACKGROUND

On September 14, 2014, Catrina and Sandra were involved in a domestic dispute. Gov. Ex. A at 15; Pl. Ex. M at 80170-78. Catrina and Sandra eventually gave conflicting accounts of the fight, but it is clear that each woman used physical violence against the other, and that both women sustained injuries. The day after the fight, Catrina sought treatment for her injuries at St. John's Hospital. Gov. Ex. A at 16; ECF No. 27 at ¶ 10. St. John's reported to the SPPD that Catrina was a victim of domestic violence, and SPPD Officer Tom Roth traveled to the hospital to interview Catrina. ECF No. 27 at ¶ 12. Catrina, who is deaf and considers ASL her primary language, used an interpreter to communicate with Officer Roth. *Id.* at ¶¶ 2, 12. Officer Roth advised Catrina that she could file a domestic-violence complaint against her mother. *Id.* at ¶ 12. At that time, Catrina was unsure whether she wanted to do so because she "was concerned about getting [her] mother in trouble with the police." *Id.* at ¶ 13. Officer Roth gave Catrina his card and told her to contact him if she decided to file a complaint. *Id.*

A day later, Sandra sought treatment for her injuries at Regions Hospital.  Gov. Ex. D at 2.  Sandra spoke to SPPD Officer Jason Pierce.  Sandra, who is also deaf and also uses ASL to communicate, explained to Officer Pierce via hand gestures and writing that she was assaulted by her daughter, Catrina.  Officer Pierce took photos of Sandra's injuries and gathered as much information as he could.  *See* Pl. Ex. M at 80086-101.  He then filed a report.  *Id.* at 80096-97.

Sandra's domestic-assault complaint was assigned to SPPD Sergeant Rob Stanway to investigate.  Pl. Ex. G at 14-15.  Based on Officer Pierce's initial report, Sergeant Stanway determined that Sandra was the victim and Catrina was the perpetrator.  Pl. Ex. G at 21-22; Gov. Ex. B.  Sergeant Stanway then took a statement from Sandra with the assistance of SPPD Officer[1] Chad Koch, who has some knowledge of ASL, but who is not a certified interpreter.  Gov. Ex. B.

Sandra told Sergeant Stanway the following:  Catrina and she got into an argument while shopping at Wal-Mart.  Gov. Ex. B at 1.  The two women left Wal-Mart and began to drive home.  *Id.*  While in the car, Catrina hit Sandra, and the two "push[ed] and shov[ed] each other."  *Id.*  The fight continued at home.  Sandra grabbed her iPad to call the police, but Catrina knocked the iPad out of Sandra's hand and punched her in the face, causing her to fall to the ground.  *Id.*  Catrina then "kicked and

---

[1]Officer Koch has since been promoted to Sergeant.  Gov. Ex. A at 22-23.

punched [Sandra] in the chest, back, and face approximately 5-7 times." *Id.* at 2. Based on Sandra's allegations, Catrina was charged with interfering with a 911/emergency call and misdemeanor domestic assault. Gov. Ex. D.

By September 24, 2014, Catrina decided that she wanted to file a domestic-violence complaint against Sandra. Catrina had not yet been informed that she had been charged with two crimes in connection with the incident. On September 24, Catrina and Stephanie Ritenour[2] (a domestic-violence advocate at Communication Services for the Deaf) called the SPPD to try to schedule a meeting so that Catrina could file a complaint. ECF No. 27 at ¶¶ 14-16. Catrina and Ritenour could not reach Officer Roth (the officer who had spoken to Catrina at St. John's Hospital), so they talked instead to Sergeant Troy Greene. *Id.* at ¶ 17; Gov. Ex. F at 18-20.

According to Catrina, she informed Sergeant Greene that she wanted to schedule a meeting to file a domestic-violence complaint against her mother, and that she would need a certified ASL interpreter for the meeting. ECF No. 27 at ¶ 19; Gov. Ex. E. Catrina alleges that Sergeant Greene responded by asking if the SPPD would "have to pay for an interpreter." ECF No. 27 at ¶ 20. Ritenour informed Sergeant Greene that the SPPD would indeed have to pay for an interpreter, and Sergeant Greene said that he

_____

[2]Ritenour's last name is spelled inconsistently in the record. Ritenour's affidavit spells her name with two "t"s. *See* ECF No. 28. But the signature block that appears in Ritenour's emails spells her name with one "t." *See* Gov. Exs. M, N. The Court will assume that Ritenour's own signature block is correct.

needed to check with someone about Catrina's request. *Id.* When Sergeant Greene

called back, he informed Catrina and Ritenour that Officer Koch—who, Sergeant

Greene said, was "fluent" in ASL—would act as an interpreter at the meeting, which

was scheduled for the following day at 8:00 am. *Id.* at ¶¶ 21, 24. Catrina had never

before communicated with Officer Koch (Gov Ex. A at 104), but Ritenour told Sergeant

Greene that they objected to using Officer Koch as an interpreter because he was not a

certified ASL interpreter. ECF No. 28 at ¶¶ 15-16; Gov. Ex. A at 41. Sergeant Greene

insisted on using Officer Koch as the interpreter. ECF No. 28 at ¶ 16.

Catrina showed up at the police department the following day (September 25)

for her 8:00 am meeting. Catrina met with Officer Koch (not Sergeant Greene). What

happened at the meeting is disputed. According to Catrina, she used ASL to describe

her version of the altercation with her mother. Gov. Ex. A at 21-22. Catrina alleges that

Officer Koch did not write anything down, but "simply nodd[ed] and nodd[ed] and

nodd[ed]" as she spoke—and then, when Catrina "got close to the end . . . he said, I

apologize. I only know finger spelling."[3] *Id.* at 21-24. Catrina says that she asked

---

[3]Fingerspelling occurs when an individual spells out a word using an ASL letter symbol for each of the word's English letters. Gov. Ex. G at 96-97; Gov. Ex. A at 105. For example, instead of using the ASL sign for "dog," the individual would use the ASL sign for "d," then the ASL sign for "o," then the ASL sign for "g."

Catrina's experts note that "[w]hile the use of fingerspelling is a common tactic used by novice signers to express English terms, it is not an equivalent way to express a
(continued...)

Officer Koch for an ASL interpreter, but that none was provided. *Id.* at 23-24.

Eventually, Officer Koch (allegedly through fingerspelling) told Catrina that there was

an outstanding warrant for her arrest, and Officer Koch pointed to another police officer

(Officer Jon Sherwood) who was about to arrest her. *Id.* at 24-26. According to Catrina,

she "did not know what 'w-a-r-r-a-n-t' spelled or what it meant," and she did not know

why she was being arrested until Officer Sherwood later wrote "interfere with 911

emergency" on a piece of paper. ECF No. 27 at ¶¶ 33-34; Gov. Ex. A at 52-53, 129.

According to Catrina, other than that four-word note from Officer Sherwood, she was

given no information about why she was arrested, and she did not even realize that her

arrest was connected to the fight with her mother. Gov. Ex. A at 52-54.

Officer Koch offers a different account of his September 25 meeting with Catrina.

According to Officer Koch, he showed up for the scheduled meeting and introduced

himself to Catrina using ASL. Gov. Ex. G at 165-66. After "she introduced herself, a

_____

(...continued)
concept and likely requires work on the part of the deaf person to determine the
signer's meaning." Pl. Ex. D at 8. Further, the experts note that "[d]epending on the
Deaf person's command of the English language influenced by their level of hearing
loss, educational background, and family upbringing, they may or may not be able to
[interpret the English spelling (English being their second language)], which may result
in misunderstanding." *Id.*

Catrina was born deaf (Gov. Ex. A at 14), she considers herself to have "limited
English Language Skills," and she says she is "confused by English language
vocabulary[,] grammar and sentence structure." ECF No. 27 at ¶ 3. Unsurprisingly,
then, Catrina finds fingerspelling "very frustrating." Gov. Ex. A at 105.

little light kind of went off," as Officer Koch "remembered that name [from] before." *Id.*

at 166. (Officer Koch apparently recognized Catrina's name from his involvement in

taking a statement from Sandra. *Id.* at 167-68.) Officer Koch decided "to see if maybe

Catrina . . . had a warrant for her arrest." *Id.* at 167. Officer Koch checked and found

that Catrina had two outstanding arrest warrants—one "for interfering with [a] 911

[emergency] and the other . . . for domestic assault." *Id.* at 168.

According to Officer Koch, he then "explained to [Catrina] that she had two

warrants for her arrest and that she was being placed under arrest and that she would

be transferred down to the Ramsey County Jail." *Id.* at 171. Officer Koch says that he

asked Catrina if she understood, and "[s]he said that she did understand, but [that] she

wanted to give a statement for a domestic assault that she was involved in." *Id.*

Because Catrina was a suspect in a criminal case, however, Officer Koch alleges that he

informed Catrina that he "wouldn't be taking a statement from her right now," but

"[t]hat she would have an opportunity to give a statement later." *Id.* at 171-72. Officer

Koch "[did not] recall" Catrina trying to tell her version of the altercation with her

mother, and, he says, he "did not have a conversation" with Catrina (aside from

advising her that she would be arrested on two outstanding warrants). *See id.* at 166-72,

175-77. Officer Koch also swears that he would have made the same decision—to arrest

a suspect on an outstanding warrant and not take a statement from her until later

(presumably after she spoke with an attorney)—regardless of whether the suspect was deaf or not.  ECF No. 22 at ¶ 6.

After Catrina was arrested, Officer Sherwood transported her to the Ramsey County Jail.  Gov. Ex. P at 22-23; Gov. Ex. J.  Sometime before being booked, Catrina sent an email to Ritenour stating: "I'm on way jail got warranty."  Gov. Ex. H at 10192 (sic).  Ritenour responded "A warrant for you?  You're going to jail?"  *Id.*  Catrina—now seemingly at the jail[4]—responded:

> Yes warrant for me, yes for Interfere with 911 emergency.
> Im on way jail until Sargent come today or to court . . . . I try
> ask [Officer Koch] to charge I can't til Sargent come first.  I
> hope interpreter here ASAP.

*Id.* at 10191 (sic throughout).

Catrina was not able to give a statement or file a domestic-violence complaint on September 25.  Accordingly, sometime after being released from jail, Catrina was again in contact with the SPPD trying to set up a time to give a statement.  Once again, there is some dispute as to exactly what happened, but it is undisputed that Catrina was never

---

[4] The testimony in the record is unclear as to precisely where Catrina was when she sent her first email ("I'm on way jail got warranty"), but a jury could conclude that Catrina sent that email before being transported to the jail.  It appears, however, that the other emails were sent after Catrina had arrived at the jail.  *See* Gov. Ex. H at 10192 (first email with a time stamp of 8:44:44 am); Gov. Ex. J (video of Catrina being transported to jail with a time stamp ranging from 8:58:55–9:07:15 am); Gov. Ex. H at 10190-91 (subsequent emails from Catrina with time stamps of 9:16:15 am, 10:44:29 am, and 12:33:57 pm).

able to file a domestic-violence complaint. According to Catrina's deposition testimony, after she was released from jail, Officer Koch and Sergeant Stanway called her house "like five or six days in a row . . . leaving messages saying that [she] should call [them] . . . and one of them[5] said they wanted [to meet with Catrina] again back at the office and wanted to extend their apologies to [her] . . . ." Gov. Ex. A at 72-73. However, Catrina "had lost trust" and "didn't want to be arrested again." *Id.* at 73.

Catrina filed a formal complaint against Sergeant Stanway, Officer Koch, and Officer Roth with the SPPD's Internal Affairs Unit ("IA"). Gov. Ex. S. In that complaint, Catrina alleges that between October 1 and October 9, 2014, Sergeant Stanway and Officer Koch "left multiple messages at [her] home videophone stating 'Please come [to] our office so we may interview you and make a report on Sandra Hooper and others.'" Gov. Ex. S at 2. Catrina further alleges in the IA complaint that during one call[6] with Officer Koch she told him "sorry I will not come to see you until you get an ASL interpreter." *Id.* She says that she "reminded him that at [their] first meeting his sign

_____

[5]Catrina later clarified that it was Officer Koch who said that he would like to apologize. Gov. Ex. A at 75.

[6]The Court is unsure of the date of this alleged call. The IA complaint states that it was on "10/19." But the IA complaint recounts events sequentially and places this call right before the October 10 entry. Given that, and given other evidence in the record (specifically, emails sent on October 9, *see* Gov. Exs. M, N), a jury could conclude that "10/19" was a typographical error, and the correct date was sometime before October 10.

language[7] was not fluent enough for [her] to understand him or be understood." *Id.* In an October 8, 2014 email, Catrina informed Ritenour that the SPPD had denied her request for an interpreter:

> I will cancel with officer [Koch] I feel lost trust him and don't want jail again. I will ask lawyer in court about it *and should go ahead without interpreter as they refused. I still want file charge* and Let see what he advice before reschedule appt.

Gov. Ex. M at 2 (sic throughout) (emphasis added).

As Officer Koch and Sergeant Stanway were attempting to schedule another meeting with Catrina, the charges against her were being amended. Specifically, on September 26, 2014, Sergeant Stanway visited Regions Hospital to get Sandra's medical records. Gov. Ex. K. Based on those records, he contacted an assistant county attorney to discuss the fact that Sandra sustained "possible fractures," "which would enhance

---

[7]Catrina clearly alleges in both her deposition and her declaration that Officer Koch only fingerspelled while communicating with her. *See, e.g.*, Gov Ex. A at 126 (Q: "Did Officer Koch on September 25, 2014 use any [ASL] signs to you?" A: "No. He finger spelled everything."); ECF No. 27 at ¶ 28 ("Officer Koch did not communicate with me using ASL. Instead he fingerspelled English words.").

Catrina's IA complaint is less clear. *See* Gov. Ex. S at 2 (". . . Officer Koch came to the lobby without a paper and pen and *in sign language* stated he didn't know ASL very well . . . (emphasis added)); *id.* ("Officer Koch *signed* 'Sorry, goodbye, you have warrant for your arrest.'" (emphasis added)).

As noted, Officer Koch testified that he generally used sign language, but did fingerspell certain words (including, for example, "warrant"). Gov. Ex. G at 166, 177. A jury will have to resolve the conflicting accounts.

[the] crime." *Id.* Given this new information, on October 1, 2014, the assistant county attorney amended the charges against Catrina from misdemeanor assault to felony third-degree assault, and a felony arrest warrant was issued. Gov. Ex. E at 1.

On October 10, 2014, SPPD Officer Colleen Rooney made a "warrant attempt" on the felony warrant at Catrina's home. Gov. Ex. O at 3. Officer Rooney was accompanied by Officer Sherwood. *Id.* The record contains conflicting evidence about what happened when Officers Rooney and Sherwood attempted to arrest Catrina pursuant to the felony warrant.

According to Catrina, "[Officer] Sherwood didn't really know what was going on and the other officer told [Catrina's] son that there was a warrant." Gov. Ex. A. at 93. Catrina's son explained to the officers "that [Catrina] had already been in jail and [had] just got out so that shouldn't be right." *Id.* Officer Sherwood made a phone call, "and then handcuffed [Catrina] and that was it." *Id.* Catrina alleges that at no point did Officer Sherwood communicate to her in writing, but instead he relied on Catrina's son to interpret the entire time. *Id.* Catrina further alleges that she "did not understand much of what the [SPPD] officers were trying to" communicate to her through her son, including "why [she] was being arrested." ECF No. 27 at ¶¶ 41-42. Rather, she only knew that she was being arrested on a warrant "for mom medical reason." Gov. Ex. A at 94.

Officer Sherwood paints a somewhat different picture. Officer Sherwood testified in his deposition that, while he "had to use [his] notepad," he "advised [Catrina that] she had a warrant for her arrest." Gov. Ex. P at 45. Officer Sherwood said Catrina "seemed confused about . . . the new warrant," so he "led her to [his] squad car and showed her on [his] laptop the actual hit or the notification of the warrant." *Id.* at 46. Officer Sherwood noted that "[e]ventually [Catrina's] son came out," and he "explained the situation to him." *Id.* Catrina's son "signed with Ms. Hooper, and explained . . . that she had a warrant for her arrest and she was under arrest." *Id.* Still, Catrina "seemed genuinely confused about the charge." *Id.*

Given Catrina's confusion, Officer Sherwood called Sergeant Stanway for clarification. *Id.* Officer Sherwood found out "that the charges [against Catrina] were amended and moved to a felony level assault based on new information." *Id.* at 52. Officer Sherwood believed that Sergeant Stanway informed him that "a medical report from the victim elevated the charge." *Id.* Officer Sherwood was "sure" that he communicated this information to Catrina through her son, and stated that he "assumed" that her son was an interpreter "based on the communication between the two of them that [he] observed." *Id.* Catrina was then transported to jail by Officer Rooney. *Id.* at 54; Gov. Ex. Q.

Later that day, Catrina emailed Ritenour "I got warranty again arrest."  Gov.

Ex. R at 10215 (sic).  About 50 minutes later, Catrina emailed Ritenour the following:

> I was arrest by my home they say I have warrant!  I already
> had it before and they say someone report October 2 for
> medical record for mom after my OFP served October 1.
> I already talk Sargent Santway and [Officer Koch] yesterday
> confirmed I will not be arrest of meet today 9 am.  I'm
> confused seem set me up
>
> I use phone in jail pls call jail lobby get me interperer

Gov. Ex. R at 10217 (sic throughout).

Catrina now brings suit against St. Paul based on these interactions with the

SPPD.  Catrina alleges that the SPPD violated the ADA, RA, and MHRA (as well as

Minn. Stat. § 611.32) by failing to effectively communicate with her regarding her two

arrests and by failing to take a domestic-violence complaint from her.  St. Paul has

moved for summary judgment on all claims.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution

might affect the outcome of the suit under the governing substantive law.  *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if

"the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255.

## B. *ADA, RA, and MHRA Claims*

Catrina contends that the SPPD violated the ADA, RA, and MHRA when it failed to communicate the circumstances of her arrests to her and when it failed to take a domestic-violence complaint from her. The ADA, RA, and MHRA prohibit a public entity from denying its services to a qualified individual with a disability by reason of that disability. *See* 42 U.S.C. § 12132 (ADA); 29 U.S.C. § 794 (RA); Minn. Stat. § 363A.12, subd. 1 (MHRA).[8] To state a claim, Catrina must demonstrate (1) that she is a qualified individual with a disability, (2) that St. Paul is a "public entity" (for ADA purposes) or receives federal funding (for RA purposes), (3) that she was denied the benefit of a service provided by St. Paul, and (4) that the denial was because of her disability. *Randolph v. Rodgers*, 170 F.3d 850, 858 (8th Cir. 1999). Moreover, because Catrina is

---

[8]"The ADA and [RA] are 'similar in substance' and, with the exception of the [RA's] federal funding requirement, 'cases interpreting either are applicable and interchangeable' for analytical purposes." *Bahl v. Cty. of Ramsey*, 695 F.3d 778, 783 (8th Cir. 2012) (citations omitted). The Court will thus analyze the ADA and RA claims together.

"In general, the ADA and the MHRA are also construed the same." *Loye v. Cty. of Dakota*, 625 F.3d 494, 496 n.2 (8th Cir. 2010) (citation omitted). Thus, in general, the Court will analyze the MHRA claims together with the ADA and RA claims.

seeking compensatory damages from St. Paul under the ADA and RA, she also needs to establish that St. Paul was "deliberately indifferent" to her rights. *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011). There is no deliberate-indifference requirement under the MHRA, but if Catrina cannot establish "malice," St. Paul may be entitled to vicarious official immunity. *Olson v. Ramsey Cty.*, 509 N.W.2d 368, 371-72 (Minn. 1993).

The parties agree that Catrina is a qualified individual with a disability, that St. Paul is a public entity (for purposes of the ADA) and receives federal funding (for purposes of the RA), and that communicating with individuals about their arrests and receiving reports from victims of crimes are services that St. Paul provides. The parties disagree about three issues: First, was Catrina actually denied the benefit of effective communication with respect to her arrests? Second, did St. Paul fail to take a domestic-violence complaint from Catrina because of her disability? And third, did St. Paul exhibit deliberate indifference (for purposes of the ADA or RA) or malice (for purposes of the MHRA)?

1. Denial of a Benefit

The ADA, RA, and MHRA "requir[e] that qualified persons with disabilities receive effective communication that results in 'meaningful access' to a public entity's services." *Bahl*, 695 F.3d at 783-84 (citing *Loye*, 625 F.3d at 496-97). Whether there was

"effective communication"—and thus "meaningful access" to a service—is "a fact-intensive inquiry and is largely context-dependent." *Durand v. Fairview Health Servs.*, 902 F.3d 836, 842 (8th Cir. 2018) (citations omitted). Given the "inherently fact-intensive" nature of the inquiry, "an effective-communication claim often presents questions of fact precluding summary judgment." *Crane v. Lifemark Hosp., Inc.*, 898 F.3d 1130, 1135 (11th Cir. 2018) (citation omitted); *see also Chisolm v. McManimon*, 275 F.3d 315, 327 (3d Cir. 2001) ("Generally, the effectiveness of auxiliary aids and/or services is a question of fact precluding summary judgment." (citations omitted)).

### a. Communication Regarding Catrina's Arrests

Catrina first contends that she did not receive effective communication about her arrests on both September 25 and October 10, 2014. In order for there to be "effective communication," an individual must—at a minimum—know why she is being arrested and with what crime she is being charged. *Bahl*, 695 F.3d at 786-87. The Court cannot find as a matter of law that Catrina had such knowledge on either September 25 or October 10.

On September 25, Officer Koch fingerspelled "w-a-r-r-a-n-t" to Catrina, and Officer Sherwood wrote "interfere with 911 emergency" on a piece of paper for her. There is no undisputed evidence that Catrina received more information than that. There is, for example, no evidence that Catrina was ever told about the second charge

against her (misdemeanor assault). Moreover, Catrina plausibly alleges that she did not understand the two pieces of information that she did receive ("w-a-r-r-a-n-t" and "interfere with 911 emergency"). Catrina says that she did not know what a "warrant" was when Officer Koch fingerspelled the word, and Catrina's first email to Ritenour on September 25 referred to a "warranty" (rather than a "warrant"). This email may (as St. Paul suggests) simply reflect a typographical error, but the Court must construe the facts in the light most favorable to Catrina.

Catrina also alleges that she did not know that her arrest was related to the fight with her mother. Again, there is nothing in the record that contradicts Catrina's assertion. As noted, there is no evidence that Catrina was ever told that she was charged with misdemeanor assault. Moreover, there is no evidence that Catrina understood "interfere with 911 emergency" to relate to the altercation with her mother.[9] *Contrast with Bahl*, 695 F.3d at 786-87 (finding that there was effective communication about an arrest when all of the charges were written on a piece of paper for the arrestee and the arrestee knew that he was arrested "[f]or fighting police"). Given all this, the Court cannot find as a matter of law that Catrina received effective communication about her September 25 arrest.

_____

[9]There is some evidence suggesting that Catrina eventually received this information from Ritenour. *See* Gov. Ex. H at 10191 (email from Ritenour to Catrina stating "Your mom filed charges a couple days ago."). But there is no evidence that Ritenour told Catrina that she was charged with misdemeanor assault.

The same is true with respect to Catrina's October 10 arrest. There is no evidence that Catrina knew that she was being arrested because the misdemeanor assault charge had been enhanced to felony third-degree assault. All parties acknowledge that there was a lot of confusion surrounding Catrina's arrest on October 10, because Catrina had already (and just recently) been arrested. *See, e.g.,* Gov. Ex. P at 52 (Officer Sherwood testifying that at Catrina's October 10 arrest "she seemed confused because she thought she'd already been charged in the case . . ."). Officer Sherwood apparently tried to clarify matters, but Catrina alleges that she "did not understand much of what the [SPPD] officers were trying to tell [her]," including "why [she] was being arrested." ECF No. 27 at ¶¶ 41-42. Catrina asserts that she knew only that she was being arrested on a warrant "for mom medical reason." Gov. Ex. A at 94. Once again, nothing in the record contradicts Catrina's claim. Catrina's emails establish that, at most, Catrina had some knowledge of a medical reason being the source of the arrest warrant. Gov. Ex. R at 10217.

Based on this record, the Court cannot hold as a matter of law that Catrina received the benefit of knowing that she was being arrested because a medical report showing the severity of her mother's injuries led the prosecutor to elevate the charges from misdemeanor assault to felony third-degree assault. Accordingly, the Court

cannot find as a matter of law that the SPPD effectively communicated to Catrina about either of her arrests.

### b. Catrina's Inability to Report a Crime

The parties agree (at least for the purposes of St. Paul's summary-judgment motion) that Catrina was denied the ability to report a domestic assault to the SPPD from September 25 to October 10.[10] St. Paul argues, however, that Catrina was not denied the ability to report a crime *because of her disability*. Pointing to the morning of September 25, St. Paul argues that Officer Koch would have arrested anyone who had an outstanding warrant—and refused to take a statement from that person at the time of her arrest—whether or not that person was disabled. But even if St. Paul is correct that Officer Koch's refusal to take a statement from Catrina on the morning of September 25 was not on account of her disability, the fact remains that St. Paul *never* took a statement from Catrina.

St. Paul argues that this is entirely Catrina's fault, because after Catrina was released from jail on September 25, she refused to meet with SPPD officers, citing

---

[10]Catrina also argues that the SPPD violated the ADA and RA when it did not have a certified ASL interpreter available at 8:00 am on September 25, when she was scheduled to meet with police officers. But the focus of the ADA and RA is on the effectiveness of the communication, and not on the particular means used to communicate. As explained below, the SPPD has a duty to provide appropriate auxiliary aids to ensure effective communication, but the SPPD does not have a duty to provide the precise auxiliary aid demanded by the deaf individual (unless, of course, it is impossible for the individual to effectively communicate without that aid).

reasons that were unrelated to her disability (such as fear of being arrested again and the desire to consult with an attorney). St. Paul may be correct. But Catrina argues that she refused to meet with SPPD because it would not provide a certified ASL interpreter. Without such an interpreter, Catrina argues, she could not effectively communicate about the domestic assault that she had experienced.

The Court finds that there is sufficient evidence in the record to make this a jury issue. Catrina testified at her deposition that, after she was released from jail on September 25, Officer Koch and Sergeant Stanway were both in contact with her trying to set up a time for her to give a statement. Gov. Ex. A at 72-73. Catrina alleges that during one conversation with Officer Koch she told him "sorry I will not come to see you until you get an ASL interpreter." Gov. Ex. S at 2. She says that she "reminded him that at [their] first meeting his sign language was not fluent enough for [her] to understand him or be understood." *Id.* An email sent by Catrina to Ritenour on October 8, 2014, appears to corroborate Catrina's claim that she did not meet with the SPPD because it refused to provide a certified ASL interpreter:

> I will cancel with officer [Koch] I feel lost trust him and don't want jail again. I will ask lawyer in court about it and *should go ahead without interpreter as they refused. I still want file charge* and Let see what he advice before reschedule appt.

Gov. Ex. M at 2 (sic throughout) (emphasis added).

Catrina's allegation that the SPPD refused her requests for a certified ASL interpreter is consistent with Sergeant Stanway's and Officer Koch's statements. *See* Gov. Ex. G at 190-91 (Officer Koch testifying that he would be the interpreter at a second meeting with Catrina); Pl. Ex. G at 47 (Sergeant Stanway testifying that Officer Koch would be the interpreter at a second meeting with Catrina).[11]

Considering all of the evidence in the record—and drawing all reasonable inferences in Catrina's favor—the Court holds that a jury could find that Catrina was denied meaningful access to the service of reporting a crime because of her disability.

### 2. Deliberate Indifference

Thus far, the Court has held that a reasonable jury could find that St. Paul denied two services to Catrina on account of her disability: effective communication regarding

---

[11]The Court has no idea what to make of an October 9, 2014, email from Catrina to Ritenour, in which Catrina states:

> I got few calls return on sign mails it's was Chad Koch 2 different message 1 message want me to meet him and *other message say will get interpreter* as confirm meet at lobby tomorrow

Gov. Ex. N at 3 (sic throughout) (emphasis added).

Catrina, Officer Koch, and Sergeant Stanway all testified that there were no plans to have a certified ASL interpreter take a statement from Catrina. Gov. Ex. A at 81-83 (Catrina); Gov. Ex. G at 190-91 (Officer Koch); Pl. Ex. G at 47 (Sergeant Stanway). The Court takes them at their word for purposes of ruling on St. Paul's summary-judgment motion.

her arrests and the ability to report that she was a victim of a crime.  But to recover

compensatory damages under the ADA or RA, Catrina must prove that St. Paul was

"deliberately indifferent to the rights secured to her [under those Acts]."  *Meagley*, 639

F.3d at 389.

Catrina argues that there are two ways that she can recover from St. Paul:[12]

First, Catrina argues, St. Paul can be held vicariously liable under the ADA or RA

for acts taken by its employees within the scope of their employment.  Thus, to hold

St. Paul liable, she need only establish that one of the SPPD officers was deliberately

indifferent, because there is no dispute that all of the SPPD officers who had contact

with her were acting within the scope of their employment.

Second, Catrina argues, even if St. Paul cannot be held *vicariously* liable under the

ADA or RA, the City can be held *directly* liable for its own deliberate indifference in

either of two circumstances:  (1) if Catrina was injured pursuant to a policy or practice

that St. Paul maintained despite knowing that there was a strong likelihood that the

policy or practice would lead to a violation of the ADA or RA, or (2) if an SPPD officer

had actual knowledge of discrimination and the requisite authority to institute

corrective measures, and yet that officer failed to act—and failed to act in a manner that

was not merely negligent, but deliberately indifferent.

---

[12]Catrina's brief is not a model of clarity.  It might be more accurate to say that
Catrina *could* have made some of these arguments, rather than that she *did* make them.

The Court examines each of these theories in turn.

*a. Vicarious Liability*

Neither the Supreme Court nor the Eighth Circuit has directly addressed the question of whether a public entity can be held vicariously liable under Title II of the ADA or the RA for the deliberately indifferent conduct of its employees. St. Paul argues that vicarious liability under these statutes is an "unestablished theory" (ECF No. 30 at 7), but that is not true. Multiple circuits have held that a public entity *can* be held vicariously liable. *See, e.g., Delano-Pyle v. Victoria Cty., Tex.*, 302 F.3d 567, 574-75 (5th Cir. 2002) (holding that a public entity can be held vicariously liable for the actions of its employees under Title II of the ADA and the RA); *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001) (same); *Rosen v. Montgomery Cty., Md.*, 121 F.3d 154, 156 n.2 and 157 n.3 (4th Cir. 1997) (same).[13] Nevertheless, the Court respectfully disagrees with those

---

[13]District courts in other circuits have followed suit. *See, e.g., Ali v. City of Newark*, Civ. A. No. 15-8374 (JLL), 2018 WL 2175770, at *4-5 (D.N.J. May 11, 2018) (finding that a public entity can be held vicariously liable for the actions of its employees under the ADA and RA); *Morales v. City of New York*, No. 13-cv-7667 (RJS), 2016 WL 4718189, at *7 (S.D.N.Y. Sept. 7, 2016) (same); *Walling v. City of Newport*, Civ. A. No. 2:14-cv-43 (WOB-JGW), 2015 WL 5304271, at *4 (E.D. Ky. Sept. 9, 2015) (same but only addressing the ADA); *Phillips v. N.H. Circuit Court*, Civ. No. 13-cv-313-JL, 2014 WL 495656, at *2 (D.N.H. Feb. 5, 2014) (same); *Doe v. Bd. of Cty. Comm'rs of Craig Cty.*, No. 11-CV-0298-CVE-PJC, 2011 WL 6740285, at *2-4 (N.D. Okla. Dec. 22, 2011) (same but only addressing the ADA); *Hildreth v. Cook Cty.*, No. 08 C 3506, 2010 WL 1656810, at *5 (N.D. Ill. Apr. 23, 2010) (same but only addressing the ADA).

courts and finds that St. Paul cannot be held vicariously liable for the actions of its employees under Title II of the ADA or the RA.

Broadly speaking, the Court is not persuaded by the decisions holding otherwise for two reasons:  First, a close examination of the text of the two statutes strongly suggests that Congress did not intend to open the door to vicarious liability.  Second, the Supreme Court found that a materially identical statute—Title IX of the Education Amendments of 1972—does not establish vicarious liability.

### i.  The Text of Title II of the ADA and the RA

The ADA consists of different titles that apply to different actors.  For example, Title I of the ADA applies to employers, while Title II of the ADA (the provision at issue here) applies to public entities.  Each title uses distinct language and establishes a distinct remedial scheme.  For example, Title I prohibits an employer from discriminating against a qualified individual with a disability in regard to hiring, firing, or promotions, or any other term, condition, or privilege of employment.  42 U.S.C. § 12112(a).  "Employer" is defined as "a person engaged in an industry affecting commerce who has 15 or more employees . . . *and any agent* of such person . . . ." 42 U.S.C. § 12111(5)(A) (emphasis added).

By contrast, Title II prohibits a public entity from denying a qualified individual with a disability the benefit of any service, program, or activity that the entity provides.

42 U.S.C. § 12132. "Public entity" is defined in relevant part to include "any State or

local government" and "any department, agency, special purpose district, or other

instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(A)-(B).

Notably, Title II of the ADA does *not* define "public entity" to include "any agent" of

the public entity, even though Title I of the ADA defines "employer" to include "any

agent" of the employer.[14] (For all relevant purposes, the language of the RA is similar to

the language of Title II of the ADA. *See* 29 U.S.C. § 794(a)-(b).)

Thus, while Title I of the ADA explicitly contemplates vicarious liability for

*employers*,[15] Title II of the ADA does not contemplate vicarious liability for *public entities*.

Given that Congress specifically addressed the issue of vicarious liability in the

---

[14]The ADA does define "public entity" to include any "other instrumentality of a
State or States or local government." 42 U.S.C. § 12131(1)(B); *see also* 29 U.S.C.
§ 794(b)(1). When read in context, however, "other instrumentality" clearly refers to a
smaller unit of, or another entity working on behalf of, a state or local government, and
not to every person employed by a state or local government. *See Epic Sys. Corp. v.
Lewis*, 138 S. Ct. 1612, 1625 (2018) ("[W]here, as here, a more general term follows more
specific terms in a list, the general term is usually understood to 'embrace only objects
similar in nature to those objects enumerated by the preceding specific words.'"
(citations omitted)).

[15]*See U.S. E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1281 (7th Cir. 1995)
(explaining that the "reason for the 'and any agent' language in the definition of
'employer' was to ensure that courts would impose *respondeat superior* liability upon
employers for the acts of their agents" (citations omitted)). The Seventh Circuit has thus
repeatedly found *respondeat superior* liability under Title I. *See, e.g., DeVito v. Chi. Park
Dist.*, 83 F.3d 878, 881 (7th Cir. 1996). So have other courts. *See, e.g., Mason v. Stallings*,
82 F.3d 1007, 1009 (11th Cir. 1996).

ADA—choosing to include language establishing vicarious liability in Title I, but

omitting such language from Title II (and the RA)—the Court finds it likely that

Congress did not intend that public entities be held vicariously liable for violations of

Title II (or the RA).  *NLRB v. Sw. Gen., Inc.*, 137 S. Ct. 929, 940 (2017) (discussing how the

*expressio unius* canon applies "when 'circumstances support[] a sensible inference that

the term left out must have been meant to be excluded'" (quoting *Chevron U.S.A. Inc. v.

Echazabal*, 536 U.S. 73, 81 (2002)).[16]

Those courts that have concluded otherwise do not acknowledge the critical

difference between the texts of Title I and Title II.  Indeed, some of the courts that have

held that vicarious liability is available under Title II have relied on decisions that

interpret the materially different language of Title I.[17]  Other courts have then followed

the lead of these courts without recognizing their mistake.  As a result, the line of cases

---

[16]The RA was passed prior to the ADA, but the Court believes that the same logic applies.  In the RA, Congress chose to incorporate the language of Title VI of the Civil Rights Act of 1964 (which has no "agent" language), and not the language of Title VII of the Civil Rights Act of 1964 (which has "agent" language).  *See* 42 U.S.C. § 2000d–4a(1) (Title VI); 29 U.S.C. § 794(b)(1) (RA); 42 U.S.C. § 2000e(b) (Title VII).  At the time that the RA was passed, Congress had demonstrated that it knew how to include language establishing vicarious liability in a civil-rights statute, and yet Congress chose not to include such language in the RA.

[17]*See, e.g.*, *Rosen*, 121 F.3d at 157 n.3 (citing a Title I case in support of its finding that there is vicarious liability under Title II); *Delano-Pyle*, 302 F.3d at 574-75 (same); *Walling*, 2015 WL 5304271, at *4 (same); *Novak v. Hall*, 139 F. Supp. 3d 901, 909 (N.D. Ill. 2015) (same); *Doe*, 2011 WL 6740285, at *2 (same).

finding vicarious liability under Title II of the ADA (and the RA) rests on a shaky foundation.  To elaborate:

The first appellate opinion finding that vicarious liability was available under Title II—*Rosen v. Montgomery County Maryland*, 121 F.3d 154 (4th Cir. 1997)—relied primarily on a Title I case (without recognizing that Title I, unlike Title II, included the "any agent" language), a case applying the Age Discrimination in Employment Act (which, like Title I, also includes "any agent" language in the definition of "employer"), and a Ninth Circuit case applying the RA.  *See Rosen*, 121 F.3d at 157 n.3 (citing *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510-11 (4th Cir. 1994) (ADEA); *AIC Sec. Investigations, Ltd.*, 55 F.3d at 1279 (Title I); *Bonner v. Lewis*, 857 F.2d 559, 566-67 (9th Cir. 1988) (RA)).

The next appellate opinion finding that vicarious liability was available under Title II—*Duvall v. County of Kitsap*, 260 F.3d 1124 (9th Cir. 2001)—relied on the same RA case on which the Fourth Circuit had relied in *Rosen*.  *See Duvall*, 260 F.3d at 1141 (citing *Bonner*, 857 F.2d at 566-67).

Finally, the Fifth Circuit relied on *Rosen* and *Duvall*—as well as on two Title I cases—in finding that vicarious liability was available under Title II.  *See Delano-Pyle*, 302 F.3d at 574-75 (citing *Duvall*, 260 F.3d at 1141; *Silk v. City of Chi.*, 194 F.3d 788, 806 (7th Cir. 1999); *Rosen*, 121 F.3d at 157; *Mason*, 82 F.3d at 1009).

In short, *Duvall* is the only appellate decision that has *not* relied on a Title I case in determining that vicarious liability is available under Title II of the ADA. (And, for a discussion of some of the problems with *Duvall*, see *Ravenna v. Village of Skokie*, No. 17 C 5685, 2019 WL 2409600, at *4-5 (N.D. Ill. June 7, 2019)). District courts that have found vicarious liability available under Title II have, for the most part, uncritically cited *Rosen*, *Duvall*, and *Delano-Pyle*, without closely examining the shaky foundation on which they rest.

In sum, this Court concludes that Congress made a deliberate decision not to include "any agent" language in the definition of "public entity" in Title II of the ADA (and in the RA), and that Congress did so because it did not intend that public entities be held vicariously liable under Title II (or the RA) for the acts of their employees.

ii. *Gebser v. Lago Vista Independent School District*

The decisions finding that a public entity can be held vicariously liable under Title II of the ADA (and the RA) suffer from a second problem: They are difficult to reconcile with *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), which held that vicarious liability is not available under Title IX of the Education Amendments

of 1972.[18]  To understand why *Gebser* (a Title IX case) is relevant to the ADA and RA, one must understand the interrelation between various civil-rights statutes:

*First*, Title II of the ADA incorporates "[t]he remedies, procedures, and rights set forth in [the RA]."  42 U.S.C. § 12133.

*Second*, the RA, in turn, incorporates "[t]he remedies, procedures, and rights set forth in [Title VI] of the Civil Rights Act of 1964."  29 U.S.C. § 794a(a)(1).  Thus, the "remedies, procedures, and rights" of both Title II of the ADA and the RA are identical to the "remedies, procedures, and rights" of Title VI.

*Third*, although Title VI and Title IX prohibit discrimination against different classes of individuals, they are otherwise virtually identical,[19] and they have been

---

[18]Many of these decisions do not even cite *Gebser*, much less attempt to reconcile their holdings with *Gebser*.  *See, e.g.*, *Duvall*, 260 F.3d at 1141 (finding that vicarious liability is available under Title II of the ADA post-*Gebser* without citing *Gebser*); *Delano-Pyle*, 302 F.3d at 574-75 (same); *Ali*, 2018 WL 2175770, at *4-5 (same); *Morales*, 2016 WL 4718189, at *7 (same); *Walling*, 2015 WL 5304271, at *4 (same); *Phillips*, 2014 WL 495656, at *2 (same); *Doe*, 2011 WL 6740285, at *2-4 (same); *Hildreth*, 2010 WL 1656810, at *5 (same).

The Fifth Circuit recently noted this potential problem, but—given various waiver and standard-of-review issues—decided it "need not reach the issue of whether [its prior case finding that vicarious liability was available under Title II of the ADA and the RA] is vulnerable to arguments about overlooked Supreme Court authority." *Plainscapital Bank v. Keller Indep. Sch. Dist.*, 746 F. App'x 355, 361-64 (5th Cir. 2018).

[19]*See, e.g.*, *Gebser*, 524 U.S. at 286 (explaining that Title IX "was modeled after Title VI," and Title VI "is parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in

(continued...)

interpreted consistently. *See, e.g.*, *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009) ("Congress modeled Title IX after Title VI . . . and passed Title IX with the explicit understanding that it would be interpreted as Title VI was." (citation omitted)); *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) ("[T]he Court has interpreted Title IX consistently with Title VI" (citation omitted)); *Grove City Coll. v. Bell*, 465 U.S. 555, 566 (1984) ("Title IX was patterned after Title VI . . . . [S]ince [Congress] approved identical language, we discern no reason to believe that . . . [it] . . . intended a different result.").

For obvious reasons, then, courts have consistently relied on Title IX cases when applying Title VI (and vice versa), and on both Title IX and Title VI cases when applying Title II of the ADA and the RA (and vice versa). [20] Thus, what the Supreme

----

[19](...continued)
education programs. The two statutes operate in the same manner, conditioning an offer of federal funding on a promise by the recipient not to discriminate . . ." (internal citation omitted)).

[20]*See, e.g.*, *Cannon v. Univ. of Chi.*, 441 U.S. 677, 694-98 (1979) (holding that a private cause of action is available under Title IX, reasoning that "Title IX was patterned after Title VI" and "when Title IX was enacted, the critical language in Title VI had already been construed [by lower courts] as creating a private remedy"); *Guardians Ass'n v. Civil Serv. Comm'n of the City of New York*, 463 U.S. 582, 594-95 (1983) (plurality opinion) (holding that a private cause of action is available under Title VI, relying on *Cannon*); *Barnes*, 536 U.S. at 185 (holding that a private cause of action is available under the ADA and RA, relying on prior Title VI cases finding a private cause of action).

*See also, e.g.*, *Barnes*, 536 U.S. at 185-89 (stating that punitive damages are not available under Title VI, and holding that punitive damages are therefore not available under Title II of the ADA or the RA either); *Mercer v. Duke Univ.*, 401 F.3d 199, 202 (4th
(continued...)

Court said in *Gebser* regarding the availability of vicarious liability under Title IX is directly relevant to the availability of vicarious liability under Title II of the ADA and the RA.

In *Gebser*, the Supreme Court addressed whether a school district could be held liable for money damages under Title IX based on the conduct of a school-district employee. *Gebser*, 524 U.S. at 277. At the outset, the Court noted that—unlike other civil-rights statutes—Title IX does not expressly create a cause of action for money damages. *Id.* at 280-83. Because the cause of action for money damages under Title IX is implied rather than express, the Court noted that it "ha[d] a measure of latitude to shape a sensible remedial scheme that best comports with the statute." *Id.* at 284 (citations omitted).

In deciding what type of "remedial scheme" would best "comport" with Title IX, the Court found it significant that Congress relied on its spending power in

––––––––––––––––––––

(...continued)
Cir. 2005) (holding that punitive damages are not available under Title IX, relying on *Barnes*).

     *See also, e.g., Guardians Ass'n*, 463 U.S. at 607 n.27 (plurality opinion) (holding that plaintiffs may recover damages under Title VI if they establish discriminatory intent); *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 70-76 (1992) (holding that a plaintiff may recover damages under Title IX if she establishes intentional discrimination, relying on *Guardians Ass'n*); *Meagley*, 639 F.3d at 388-89 (holding that a plaintiff may recover damages under Title II of the ADA and the RA if she establishes intentional discrimination, relying on *Guardians Ass'n*).

promulgating Title IX.  The Court treats spending-clause legislation as "essentially . . . a contract between the Government and the recipient of funds," and therefore "examine[s] closely the propriety of private actions holding the recipient liable in monetary damages . . . ."  *Id.* at 286-87.[21]  The Court also found it significant that "Title IX's express means of enforcement—by administrative agencies—operates on an assumption of actual notice" to an "appropriate person" (and an opportunity for voluntary compliance before administrative-enforcement proceedings can commence).  *Id.* at 288.  The Court concluded that it was "sensible to assume that Congress did not envision a recipient[]" being liable to individuals for money damages in a situation in which the recipient was "unaware of the discrimination."  *Id.* at 287-88.

The Court thus held that a school district could not be found vicariously liable under Title IX for acts committed by school-district employees in the course of their employment.  *Id.* at 289-90.  But the school district could be held directly liable for the

_____

[21]The logic of this is simple.  A law that relies on Congress's spending power essentially offers a deal to potential recipients:  The government will give money to the recipient, and, in return, the recipient will agree to certain conditions.  In order for such an agreement between the government and recipient to be knowing and voluntary, the recipient must have fair notice of what obligations and liabilities it is assuming.  *See, e.g.*, *Barnes*, 536 U.S. at 185-89 (concluding that punitive damages were not available under spending-clause legislation (specifically, Title VI), noting that "'[w]ithout doubt, the scope of potential damages liability is one of the most significant factors a school would consider in deciding whether to receive federal funds,'" and "it is doubtful whether they would even have *accepted the funding* if punitive damages liability was a required condition" (citation omitted)).

conduct of employees "who at a minimum ha[ve] authority to address the alleged discrimination and to institute corrective measures on the [school district's] behalf," if those employees "ha[ve] actual knowledge of discrimination" and yet "fail[] adequately to respond." *Id.* at 290.

Given the close relationship between Title IX, on the one hand, and Title II of the ADA and the RA, on the other hand, the Court deems *Gebser* to control the question of whether a public entity can be held vicariously liable under Title II or the RA. Any private cause of action under Title II or the RA is implied, not express (as it is true under Title IX), and Congress relied on its spending power in enacting the RA[22] (as it did in enacting Title IX). Moreover, because the RA incorporates Title VI's express enforcement mechanism, the RA (like Title IX) requires that a public entity receive actual notice of a violation and fail to remedy that violation before losing its federal funding.[23]

---

[22]The ADA was not promulgated under Congress's spending-clause power. But because the ADA incorporates the "remedies, procedures, and rights" of the RA—and thus, the "remedies, procedures, and rights" of spending-clause legislation—the Supreme Court has rejected the argument that this makes any difference. *Barnes*, 536 U.S. at 189 n.3.

[23]*See* 29 U.S.C. § 794a(a)(2) (the RA incorporating "[t]he remedies, procedures, and rights set forth in [T]itle VI," which are found at 42 U.S.C. § 2000d et seq. and impose notice requirements).

For all of these reasons, the Court holds that St. Paul cannot be held vicarious

liable under either Title II of the ADA or the RA.  If Catrina is going to recover damages

from St. Paul, she must establish that the City is directly liable to her.[24]

### b.  Direct Liability

The parties agree that St. Paul can be held directly liable to Catrina if she was

injured pursuant to a policy or practice that St. Paul maintained despite knowing of

"the strong likelihood that [the] questioned policies will likely result in a violation of

federally protected rights."  *Meagley*, 639 F.3d at 389 (quotation omitted).  In addition,

---

[24]The Eleventh Circuit came close to reaching this conclusion in *Liese v. Indian River County Hospital District*, 701 F.3d 334 (11th Cir. 2012).  In *Liese*, the Eleventh Circuit embraced the *Gebser* standard as the direct-liability standard under the RA, and thoroughly explained why it believed that *Gebser*'s Title IX pronouncements applied with equal force in the RA context.  *Liese,* 701 F.3d at 345-49.  But the court also noted that the plaintiffs had "waive[d]" any potential vicarious-liability argument, and, accordingly, concluded that it need not decide the vicarious-liability question.  *Id.* at 349 n.10.  Thus, while the court found that *Gebser* provided the correct standard for direct-liability purposes, it did not explicitly address the vicarious-liability issue.  *Id.*

Just recently, the Eleventh Circuit concluded that "the availability of respondeat superior for Title II [ADA] and [RA] claims remains an open question."  *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134 n.6 (11th Cir. 2019) (citation omitted).  The court added that, given *Gebser*, and consistent with its logic in *Liese*, "there may be reason to think" that public entities can *not* be held vicariously liable.  *Id.*  The Court agrees, and agrees with much of the Eleventh Circuit's analysis in *Liese*.

The Court notes that the Second Circuit also followed *Gebser* in one case, although it noted that "[n]othing suggests" that the RA's standard for damages is the same as Title IX's.  *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275-77 (2d Cir. 2009).  Given the interrelatedness between Title IX and the RA though, this Court disagrees with the Second Circuit that "nothing suggests" that the standards are the same.

this Court believes that, under *Gebser*, St. Paul can be held directly liable to Catrina if she proves that there was a St. Paul "official who at a minimum ha[d] authority to address the alleged discrimination and to institute corrective measures on the [City's] behalf," but who exhibited deliberate indifference (and not merely negligence) when he failed to take such measures. *Gebser*, 524 U.S. at 290. The Court will address each of these potential grounds of direct liability.

i. City Policy or Practice

The first way that Catrina could hold St. Paul directly liable is by proving that the City maintained a policy or practice despite knowing that there was a strong likelihood that the policy or practice would lead to a violation of rights under the ADA or RA. *Meagley*, 639 F.3d at 389. Catrina does not seem to contend that St. Paul's policy regarding communicating with deaf individuals about their *arrests* led to the violation of her rights.[25] Catrina also did not contend—at least initially—that there was a problem with St. Paul's policies regarding communicating with deaf individuals attempting to report a crime. But Catrina was under the impression that St. Paul was

_____

[25]This is sensible, as St. Paul's policy merely directs its officers to follow the law. *See* Gov. Ex. U at 1 ("It is the policy of the [SPPD] to furnish appropriate aids and services whenever necessary to ensure effective communication with individuals who are disabled in communication . . ."); *id.* ("Saint Paul Police officers are required to communicate to all suspects why they are being detained or arrested."). It is also clear that St. Paul trained its police officers to follow this policy. *See* Gov. Ex. X at STP 270 (training PowerPoint stating that "Saint Paul Police officers are required to communicate to all suspects who are being arrested").

honoring a prior settlement agreement ("the *Bahl* settlement") that required St. Paul to provide certified ASL interpreters at all scheduled meetings with deaf individuals. In fact, St. Paul has not incorporated the terms of the *Bahl* settlement into its policies—and, indeed, St. Paul appears to be in breach of the *Bahl* settlement.[26]

Unfortunately for Catrina, though, this Court does not have jurisdiction to enforce the *Bahl* settlement. Catrina is bringing ADA and RA claims, and she is only seeking compensatory damages. Thus, Catrina must show that St. Paul acted with deliberate indifference to her rights under *those statutes*, and not under the *Bahl* settlement. The *Bahl* settlement may require that St. Paul provide a certified ASL interpreter at every scheduled meeting with a deaf person, but the ADA and RA do not. Instead, the ADA and RA require only that St. Paul effectively communicate with the deaf. Again, the focus of the ADA and RA is on the effectiveness of the communication, and not on the particular means used to communicate.

---

[26]Catrina cites a number of documents as supporting her contention that St. Paul's official policy is to "[u]se qualified interpreters for interviews and scheduled events, including interviews with suspects and arrestees." ECF No. 26 at 16-17. But only one of the cited documents (the *Bahl* settlement agreement) actually supports that proposition. *See* Pl. Ex. K at § V.C.2. The other cited documents make clear that—with the exception of post-arrest interrogation of a suspect—"effective communication" is St. Paul's standard, and SPPD officers will supply "appropriate auxiliary aids" when necessary to meet that standard. *See* Gov. Exs. U, V; Pl. Exs. F, H.

After St. Paul entered into the *Bahl* settlement, the section of the SPPD manual addressing communication with the deaf was amended, training bulletins on the topic were sent out to SPPD officers, and in-person training was provided to all officers. Through these materials and training, St. Paul made it clear to SPPD officers that it was City policy to "provide full and equal access to and benefit from services of the [SPPD] to deaf or hard-of-hearing individuals." Gov. Ex. V at 1. The policies require that the SPPD "furnish appropriate aids and services whenever necessary to ensure effective communication with individuals who are disabled in communication . . . ." Gov. Ex. U at 1. The policies also make clear that it is the job of SPPD officers to provide such auxiliary aids. *Id.* In their depositions, the officers who had contact with Catrina all seemed to be aware of the City's policies—that is, they all seemed to know that they had to ensure effective communication with deaf individuals and that they were responsible for providing the necessary auxiliary aids to ensure effective communication.[27]

_____

[27]*See, e.g.*, Gov. Ex. F at 29-30 (Sergeant Greene testifying that policy is to "do what is necessary to communicate," and "to do what is reasonable, provide services, resources to communicate"); Gov. Ex. G at 130 (Officer Koch testifying that policy is for the "officer to try to effectively communicate . . . and see if [he] can figure out the situation," and if the officer is unable to do so or if he "need[s] additional assistance" an interpreter may be called in); Gov. Ex. P at 60-61 (Officer Sherwood testifying that if an individual "has a problem communicating or understanding the situation they're in . . . or even just trying to communicate an offense or report a crime, that they're provided with an interpreter that can effectively communicate that"); Pl. Ex. G at 100 (Sergeant
(continued...)

Neither the ADA nor the RA requires anything more.  St. Paul's policies—like the ADA and RA—require that, when necessary to communicate effectively, appropriate auxiliary aids be provided to qualified individuals.  Nothing suggests that St. Paul maintained these policies with knowledge that they were likely to lead to a violation of the ADA or RA.

In addition, nothing suggests that St. Paul maintained any *practice* knowing that the practice was likely to lead to a violation of the rights of deaf individuals.  St. Paul did maintain a practice of using Officer Koch to communicate with hearing impaired persons and retaining a certified ASL interpreter only if Officer Koch could not communicate effectively (as well as for post-arrest interrogation).  But there is no evidence that, prior to Officer Koch's meeting with Catrina on September 25, St. Paul received any complaints about his ability to communicate with the deaf.[28]  Officer Koch

---

(...continued)
Stanway testifying that policy requires officers to communicate effectively with deaf individuals using auxiliary aids).

[28]It is true that, during the September 24 phone call, Ritenour objected to the SPPD's decision to use Officer Koch as an interpreter at the September 25 meeting with Catrina.  ECF No. 28 at ¶ 16.  Ritenour's objection was based on some clients complaining to *her* about Officer Koch's ASL abilities.  *Id.* at ¶ 15.  There is no evidence that Ritenour's clients ever complained *to the SPPD*.  In other words, there is no evidence that the SPPD "repeatedly sent [an interpreter] to interpret for [Catrina] notwithstanding longstanding and unwavering complaints about [the interpreter's] ability to interpret."  *Saunders v. Mayo Clinic*, No. 13-CV-1972 (JNE/HB), 2015 WL 774132, at *6 (D. Minn. Feb. 24, 2015).

(continued...)

had acted as an interpreter on many prior occasions (Gov. Ex. G at 113-14), including when taking a statement from Catrina's mother (who is also deaf, and who also uses ASL to communicate).  Under the circumstances, St. Paul did not act with deliberate indifference when it maintained the practice of using Officer Koch to handle initial communication with deaf individuals.  *See* 28 C.F.R. § 35.160(b)(1) (requiring that a public entity "furnish *appropriate auxiliary aids* and services *where necessary* to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity" (emphasis added)); *Liese*, 701 F.3d at 343 (discussing how "the simple failure to provide an interpreter on request is not necessarily deliberately indifferent to an individual's rights under the RA.  Indeed, construing the regulations in this manner would effectively substitute 'demanded' auxiliary aid for 'necessary' auxiliary aid").[29]

---

(...continued)

     Based on the record before the Court, a jury could not find that the SPPD was on notice that Officer Koch's signing abilities were deficient or that using him as an interpreter was likely to lead to a violation of Catrina's rights.

     [29]The regulations promulgated under the ADA require that a public entity, "[i]n determining what types of auxiliary aids and services are necessary, . . . give primary consideration to the requests of individuals with disabilities."  28 C.F.R. § 35.160(b)(2). This primary-consideration requirement is not in the SPPD manual or the training materials.  *See* Gov. Exs. U, V.  Nonetheless, most of the SPPD officers testified that this would be a reasonable thing to do, or acknowledged that the deaf individual is likely to be in the best position to know what sort of auxiliary aid is appropriate for him or her. *See*, *e.g.*, Gov. Ex. P at 65; Gov. Ex. F at 71-73; Gov. Ex. G at 124-25.  The Court cannot

(continued...)

ii.  Officer Conduct

The other way that St. Paul could be held directly liable to Catrina under the ADA or RA is if an SPPD officer had actual knowledge of discrimination and had the authority to take corrective measures, and yet failed to act—and failed to act in a way that was not merely negligent, but deliberately indifferent.  *Gebser*, 524 U.S. at 290. Simply being aware that an individual requested a particular auxiliary aid and failing to provide that aid is not "actual knowledge" of discrimination or "deliberate indifference" to the individual's rights; rather, "actual knowledge" of discrimination requires that an officer know that communication is not effective, and "deliberate indifference" requires failing to take an appropriate action (i.e., failing to provide a needed auxiliary aid).  *See* 28 C.F.R. § 35.160(b)(1); *Liese*, 701 F.3d at 343.[30]

---

(...continued)
say that St. Paul acted with deliberate indifference when it failed to include this primary-consideration requirement in its manual, given that St. Paul communicated to its officers in multiple ways that they had an obligation to ensure effective communication with deaf individuals.

[30]*See also Tucker v. Tennessee*, 539 F.3d 526, 537 (6th Cir. 2008) (noting that the ADA does not impose "strict liability simply because the jail failed to provide exactly the auxiliary device [that plaintiffs] requested"); *Biondo v. Kaleida Health*, Case # 15-CV-362-FPG-LGF, 2018 WL 1726533, at *3 (W.D.N.Y. Apr. 10, 2018) (discussing how under the RA "[p]atients with disabilities are not entitled to the auxiliary aid of their choice unless it is necessary to ensure effective communication" (citation omitted)).

*A. Communication Regarding Catrina's Arrests*

Catrina alleges that Officers Koch and Sherwood acted with deliberate indifference in failing to protect her right to effective communication regarding her arrests. Even assuming that both of these officers had "authority to address the alleged discrimination and to institute corrective measures," there is no evidence that they had "actual knowledge" that Catrina was being discriminated against with regard to communication about her arrests. *Gebser*, 524 U.S. at 290.

As to the first arrest (on September 25): Before Catrina was arrested, Officer Koch fingerspelled "warrant" to Catrina and informed her that she would be transported to jail. Gov. Ex. G at 177; Gov. Ex. A at 109, 111, 126. Officer Koch also indicated to Catrina that Officer Sherwood would be transporting her. Gov. Ex. G at 175; Gov. Ex. A at 26, 50. Catrina alleges that at some point when she was trying to give her statement she realized that Officer Koch did not understand her and asked him for an interpreter (Gov. Ex. A at 23-24), but there is no evidence that Catrina informed Officer Koch that she needed an interpreter because she did not understand *his communication about her arrest*. For example, there is no evidence that Catrina informed Officer Koch that she did not understand the word "warrant" or why she was being transported to jail. Based on these facts, a jury could not find that Officer Koch had

"actual knowledge" that Catrina was being discriminated against by not receiving effective communication concerning her arrest.

The same is true of Officer Sherwood. According to Catrina, sometime after Officer Sherwood took custody of her on September 25, he wrote "interfere with 911 emergency" on a sheet of paper so that Catrina would know (at least one of) the charges against her. Gov. Ex. A at 52-53. While Catrina again alleges that she asked for an interpreter, she also noted that Officer Sherwood communicated with her on paper "trying to understand why" she needed an interpreter. *Id.* at 53-54. Once again, there is no evidence in the record that Catrina told Officer Sherwood that she needed an interpreter because she did not understand what was going on with respect to her arrest. There is no evidence that Catrina ever asked Officer Sherwood to clarify what a "warrant" was, or what the charges against her were, or any other fact regarding her arrest. Indeed, at Catrina's request, Offier Sherwood appears to have discussed the situation thoroughly with Ritenour, and Ritenour emailed Catrina to inform her that her "mom filed charges a couple days ago," and "[t]he officer said he ha[d] no choice, ha[d] to arrest you but you will be able to tell your side of the story in court." Gov. Ex. A at 52-53; Gov. Ex. H at 10191. Thus, based on the record, there would be no basis for a jury to find that, on September 25, Officer Sherwood had "actual knowledge" that Catrina was experiencing discrimination.

As to the second arrest (on October 10):  Officer Sherwood used Catrina's son to communicate information about her arrest.  Gov. Ex. A at 93-94; Gov. Ex. P at 45-46.[31] Officer Sherwood testified "that based on the communication between [Catrina and her son] that [he] observed," he "assumed" that Catrina's son was an interpreter.  Gov. Ex. P at 52.  There is no evidence in the record that (on October 10) Catrina told Officer Sherwood that she objected to him using her son as an interpreter, or that she requested a certified ASL interpreter, or that she was placed under arrest despite insisting that she did not know what was going on.  Officer Sherwood admitted that there was initially some "confusion" about the arrest warrant, but he called Sergeant Stanway to clarify the situation, and then used Catrina's son to pass on the clarifying information.  Gov. Ex. P at 46-52.  Although Catrina now claims that she did not understand the communication from her son—and although the Court cannot hold as a matter of law the communication was, in fact, effective—there is no evidence in the record that Officer Sherwood *knew* that he was not effectively communicating with Catrina through her son.  Based on the record before the Court, a jury could not find that, on October 10, Officer Sherwood had "actual knowledge" that Catrina was suffering discrimination.

---

[31]There is disagreement as to whether Officer Sherwood used only Catrina's son to communicate, or whether he also wrote using a pen and paper.  For purposes of St. Paul's summary-judgment motion, the Court must take Catrina's version of events—that Officer Sherwood only used her son to communicate with her—as true.

## B. *Catrina's Inability to Report a Crime*

With respect to Catrina's inability to report a crime, there are three potentially relevant SPPD actors: Sergeant Greene, Sergeant Stanway, and Officer Koch.

As to Sergeant Greene: Sergeant Greene's only interactions with Catrina were telephone conversations facilitating the initial September 25 meeting. ECF No. 27 at ¶¶ 17-24; Gov. Ex. F at 47-54. Specifically, Sergeant Greene fielded a phone call from Catrina and Ritenour on September 24, and during that call, Catrina and Ritenour told Sergeant Greene that Catrina wanted to meet to report a domestic-violence incident and requested a certified ASL interpreter for the meeting. ECF No. 27 at ¶¶ 17-24; Gov. Ex. F at 20-24; Gov. Ex. E at 1. Sergeant Greene allegedly asked if the SPPD would have to pay for the interpreter, and—after Ritenour told him yes—he told Catrina and Ritenour that he would have to get back to them. ECF No. 27 at ¶ 20. When Sergeant Greene called Catrina and Ritenour back, he informed them that Officer Koch—who was "fluent" in ASL—would interpret. *Id.* at ¶ 21.

There is no evidence to show that Sergeant Greene had "actual knowledge" that Officer Koch was *not* "fluent" in ASL or that Officer Koch could not effectively communicate with Catrina. When Catrina told Sergeant Greene that she did not want to use Officer Koch but instead wanted to use a certified ASL interpreter, she was not claiming that she could not effectively communicate with Officer Koch. She had never

even met Officer Koch, and she had no idea whether he was proficient in ASL. Rather, she was simply demanding a certified ASL interpreter, which was not her right under the ADA or RA (unless Officer Koch proved to be unable to communicate with her effectively). Under the circumstances, Sergeant Greene did not act with deliberate indifference when he did not immediately accede to Catrina's demand.

As to Sergeant Stanway: If the evidence in the record is construed in the light most favorable to Catrina, Sergeant Stanway appears to have played the following role in attempting to take a statement from her: On September 24, Sergeant Stanway received a call from Sergeant Greene and was informed that "Catrina wanted to meet with an officer and a certified ASL interpreter to make a police report . . . [because] she had been assaulted by her mother." Gov. Ex. E at 1. Sergeant Greene gave Catrina's phone number to Sergeant Stanway, and Sergeant Stanway believed that it was his job to set up a meeting with Catrina. *Id.*; Pl. Ex. G at 42. Sergeant Stanway did not call Catrina until September 29 and appeared to have no knowledge of the September 25 meeting and arrest until after they happened. Gov. Ex. E at 1; Pl. Ex. G at 42-45. Catrina does not contend that she spoke to Sergeant Stanway prior to September 25. *See* ECF No. 27; Gov. Ex. A.[32] Thus, the only involvement that Sergeant Stanway could have had

---

[32]In her IA complaint, Catrina appears to indicate that Ritenour and she talked to Sergeant *Stanway* on the phone sometime before the September 25 meeting, and makes no mention of Sergeant *Greene*. *See* Gov. Ex. S at 1. This is the only place in the entire

(continued...)

in the September 25 meeting is to advise Sergeant Greene to seek out Officer Koch to act

as an interpreter.  Even if Sergeant Stanway made this suggestion, he did not act with

deliberate indifference, because he had no reason to know that using Officer Koch as an

interpreter would lead to an ADA or RA violation.

After September 25, Sergeant Stanway made several attempts to set up a meeting

with Catrina.  Gov. Ex. S at 2; Gov. Ex. E; Gov. Ex. A at 72-73.  Sergeant Stanway

appeared to believe that he had arranged a meeting with Catrina for October 10; at that

meeting, Sergeant Stanway was going to use Officer Koch as an interpreter.  Gov. Ex. E;

Pl. Ex. G at 39-40.  But Officer Koch informed Sergeant Stanway on October 9 that

Catrina had cancelled the meeting because she wanted to speak to her lawyer.  Gov.

Ex. E; Pl. Ex. G at 39-40.  Once more, there is no evidence to suggest that Sergeant

Stanway knew that using Officer Koch at the October 10 meeting would have amounted

to discrimination.  To the contrary, Sergeant Stanway knew that Officer Koch was able

---

(...continued)
record that this allegation is made; the record is otherwise consistent (including in
Catrina's affidavit, and in her deposition), that Ritenour and she talked to Sergeant
*Greene* on September 24 to set up the September 25 meeting.  The Court thus assumes
that Catrina simply made a mistake in her IA report.

to interpret and get a statement during their meeting with Catrina's mother,[33] and he believed Officer Koch was a "qualified" interpreter.  *See, e.g.*, Pl. Ex. G at 23-24, 116-18.

As to Officer Koch:  Construing the evidence in the light most favorable to Catrina, the Court concludes that a jury could find that Officer Koch had actual knowledge of discrimination and the "authority to address the alleged discrimination and to institute corrective measures," and that Officer Koch acted with deliberate indifference in failing to take such "corrective measures."  *Gebser*, 524 U.S. at 290. According to Catrina, after she was released from jail on September 25, Officer Koch and she had discussions about meeting again so that she could give a statement. Catrina's IA complaint alleges that in one call with Officer Koch she told him "sorry I will not come to see you until you get an ASL interpreter."  Gov. Ex. S at 2.  In the same report, she says that she "reminded [Officer Koch] that at [their] first meeting his sign language was not fluent enough for [her] to understand him or be understood."  *Id.* A contemporaneous email sent by Catrina to Ritenour on October 8, 2014, tends to corroborate Catrina's allegations:

> I will cancel with officer [Koch] I feel lost trust him and don't want jail again.  I will ask lawyer in court about it and *should*

---

[33]*See* Pl. Ex. G at 97-98 (Sergeant Stanway testifying that he specifically asked Sandra's granddaughter if Officer Koch was effectively communicating with her grandma, and the granddaughter assured him that Officer Koch was); *see also* Pl. Ex. M at 80068-70, 80079-80 (Sandra testifying that she understood Officer Koch's signing).

> *go ahead without interpreter as they refused. I still want file*
> *charge* and Let see what he advice before reschedule appt.

Gov. Ex. M at 2 (sic throughout) (emphasis added).

If a jury were to believe Catrina's allegations—that, despite her informing Officer Koch that he was *not* effectively communicating with her, he nevertheless insisted on continuing to act as the interpreter—the jury could find that Officer Koch had actual knowledge of discrimination.

A jury could also find that Officer Koch was an official with "authority to address the alleged discrimination and to institute corrective measures." *Gebser*, 524 U.S. at 290. An individual who is given complete discretion at a key decision point—such as compete discretion to deny or grant a request for a particular auxiliary aid—can satisfy *Gebser*'s standard. *Liese*, 701 F.3d at 349-52; *see also Sunderland v. Bethesda Hosp., Inc.*, 686 F. App'x 807, 816-18 (11th Cir. 2017). And that individual can be deemed to have "complete discretion" even when his decision is "technically subject to review." *Id.*[34]

_____

[34]The Eleventh Circuit seems to believe that *Gebser*'s use of the word "official" imposes some sort of requirement in addition to the requirement that the individual have "authority to address the alleged discrimination and to institute corrective measures." *Liese*, 701 F.3d at 349-50. The Court does not agree. It appears to the Court that *Gebser* used the word "official" merely to connote that the actor whose conduct is at issue must be an employee or agent of the public entity—that is, someone for whose conduct the public entity is responsible. Certainly, the Eighth Circuit has required nothing other than the individual have "authority to address the alleged discrimination

(continued...)

In *Sunderland v. Bethesda Hospital, Inc.*, the Eleventh Circuit had to decide whether a jury could find that a hospital's nurses had the requisite authority under *Gebser*. *Sunderland*, 686 F. App'x at 816-18. The hospital's policy regarding communication with deaf individuals gave the hospital's nurses discretion to determine what auxiliary aids were necessary. The policy also provided that "[w]hen a nurse finds that an in-person interpreter is needed, the Nursing Supervisor is tasked with seeking approval from a hospital administrator for the interpreter." *Id.* at 810. Even though the nurses needed approval to retain an in-person interpreter, the Eleventh Circuit held that a jury could find that the nurses had the requisite authority under *Gebser*, as the nurses decided what interpretive aids to provide and "in most situations, a patient [could] access an in-person interpreter only if her nurse decide[d] that . . . other aids [were] not appropriate." *Id.* at 810, 816. Put differently, nurses had "authority to reject unilaterally requests for in-person interpreters," and nurses' decisions were generally not "subject to reversal." *Id.* at 816.

Much the same could be said about Officer Koch. SPPD policies require that *officers* provide appropriate auxiliary aids to ensure effective communication with

_____

(...continued)
and to institute corrective measures." *See, e.g., Plamp v. Mitchell Sch. Dist.*, 565 F.3d 450, 456 (8th Cir. 2009) (stating that an "'appropriate person'" under *Gebser* "is one 'who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf'" (citations omitted)).

individuals who are disabled in communication.  Gov. Ex. U.  If an officer determines

that effective communication can occur with a pen and paper, or by using a family

member to translate, that officer has "authority to reject unilaterally requests for

in-person interpreters."  *Sunderland*, 686 F. App'x at 816.  And although SPPD policy

requires that a request for an interpreter be approved by a supervisor or unit

commander, there is evidence that this policy is not always followed, and that—when it

is followed—the request is usually not rejected.[35]  In other words, the officers' decisions

are generally not "subject to reversal."  *Id.*

Officer Koch not only had the general authority provided to all officers by SPPD

policies, but SPPD supervisors had specifically tasked Officer Koch with handling

communication with Catrina.[36]  Given that St. Paul delegated to Officer Koch the

responsibility for effectively communicating with Catrina (and determining whether

---

[35]*See, e.g.*, Pl. Ex. N at 78 (testimony from SPPD Sergeant Gayle Porter-Johnson
that, when she needs a translator/interpreter, she "do[es]n't bother going to [her]
commander" and that "[she doesn't] think most [officers] that have experience under
[their] belt feel like [they] have to get the authority from [their] commanders"); *id.* at 79
(testimony that "the expectation is . . . that, you know, we are going to just go and call
an interpreter if we need one"); *id.* (testimony that if unit commanders receive a
translator/interpreter request they will not reject the request because of the cost; rather,
they do what is needed).

[36]Testimony in the record establishes that Sergeant Greene is a "supervisor," *see,
e.g.*, Gov. Ex. G. at 195; Pl. Ex. O at 152, and that Sergeant Greene was "putting the
responsibility on [Officer Koch] to figure out if this was a situation that [the SPPD]
needed . . . to contact TransLanguages [the interpreter provider used by the SPPD] to
interpret the situation . . .", Gov. Ex. G at 195-96.

she needed a certified ASL interpreter), St. Paul should be held liable if Officer Koch acted with deliberate indifference in his assigned role.

In short, the Court finds that, if all evidence is construed in the light most favorable to Catrina, a jury could find that Officer Koch had authority to address the alleged discrimination and to institute corrective measures and was deliberately indifferent in failing to do so.

3. Malice

Catrina has brought a claim against St. Paul under the MHRA. St. Paul argues that it is entitled to "vicarious official immunity" on Catrina's MHRA claim. ECF No. 21 at 1, 27-29; ECF No. 30 at 7-9.

Under Minnesota law, if a public official is entitled to official immunity, then "his or her government employer" is also "[g]enerally" immune from suit under the doctrine of vicarious official immunity. *Anderson v. Anoka Hennepin Indep. Sch. Dist. 11*, 678 N.W.2d 651, 663-64 (Minn. 2004). A public official in Minnesota is typically entitled to official immunity when his decision requires "'the exercise of his judgment or discretion,'" but not when his decision arises from "the execution of ministerial, rather than discretionary, functions." *Id.* at 655 (citation omitted). But even when a public official is making a decision that requires "the exercise of his judgment or discretion,"

he is not entitled to official immunity if he acts willfully or with malice. *Id.*[37] When a

public official is not entitled to official immunity, the public entity that employs him is

not entitled to vicarious official immunity.

Every decision that Catrina challenges reflects an exercise of judgment or

discretion by an SPPD officer. As long as an SPPD officer is not engaged in post-arrest

interrogation, St. Paul's policies give the officer discretion to determine how best to

communicate with a hearing-impaired person. Gov. Ex. U; *see also Walker v. Hennepin*

*Cty.*, No. A10-1703, 2011 WL 1237567, at *5 (Minn. Ct. App. Apr. 5, 2011) (discussing

how, in the context of a workplace-accommodation request, "[a] public official's

response . . . is generally viewed as a discretionary decision . . .").[38] Because all of the

---

[37]"In the official immunity context, wilful and malicious are synonymous." *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991). The Court will therefore simply use the term "malice."

[38]Catrina initially argued that deciding whether to provide a certified interpreter at a scheduled meeting is a ministerial decision. ECF No. 26 at 43-44. But Catrina's argument rested on the assumption that St. Paul was following the *Bahl* settlement, which required the SPPD to provide a certified interpreter at every scheduled meeting with a deaf individual. As noted, Catrina's assumption is incorrect.

Catrina also attempts to cherry pick Sergeant Loretz's deposition testimony to find support for her argument that St. Paul requires a certified interpreter at every scheduled meeting with a deaf person. ECF No. 26 at 28 (citing Pl. Ex. O at 75). But when Sergeant Loretz's deposition is read in its entirety, it becomes clear that Sergeant Loretz testified that officers have discretion to determine when an interpreter is needed (except that an interpreter is required for post-arrest interrogation). *See, e.g.*, Pl. Ex. O at 72, 77-81.

SPPD officers's decisions were discretionary, the officers are entitled to official

immunity unless they acted with malice.  *Anderson*, 678 N.W.2d at 655.

In the context of Minnesota official-immunity doctrine, "malice" "means

intentionally committing an act that the official has reason to believe is legally

prohibited."  *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 663 (Minn. 1999) (citation

omitted).  The malice standard thus "contemplates less of a subjective inquiry into

malice . . . and more of an objective inquiry into the legal reasonableness of an official's

actions."  *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn. 1994).

This Court has previously held "that this objective inquiry into legal reasonableness is

the same as the inquiry into whether [a public official's] intent was sufficiently culpable

to support liability for compensatory damages under the ADA and the Rehabilitation

Act."  *AP v. Anoka-Hennepin  Indep. Sch. Dist. No. 11*, 538 F. Supp. 2d 1125, 1149-50

(D. Minn. 2008).[39]   In other words, this Court has previously held that the question

_____

[39]At oral argument, Catrina seemed to contend that the malice and
deliberate-indifference standards might be different in some (unexplained) way
because—under Minnesota law—a violation of the MHRA necessarily indicates malice.
*See also* ECF No. 26 at 42-43.  The Court disagrees.

In cases in which a public official has been found *not* to be entitled to official
immunity under the MHRA, the underlying discrimination claim would have
(essentially) required a showing of malice.  This is because the underlying allegations
were, for example, that an individual was racially profiled, or an individual was fired
because of sex or disability.  Someone found to have engaged in racial profiling or to
have fired someone on account of a protected trait has necessarily acted with malice.

(continued...)

whether a public official acted with "malice" for purposes of Minnesota official-

immunity law is identical to the question of whether a public official acted with

"deliberate indifference" for purposes of the ADA and RA.

The Court has already determined that a reasonable jury could not find that

Sergeant Greene, Sergeant Stanway, or Officer Sherwood acted with deliberate

indifference, and thus all three are entitled to official immunity under Minnesota law.

The Court has also determined that a reasonable jury could not find that Officer Koch

---

(...continued)
*See, e.g., Beaulieu*, 518 N.W.2d at 572-73 (racial profiling); *Walker*, 2011 WL 1237567, at *4-7 (fired because of disability); *Williams v. Minneapolis Police Dep't*, Nos. A09-1650, A09-1669, 2010 WL 2650495, at *4-8 (Minn. Ct. App. July 6, 2010) (racial profiling); *Elofson v. Chisago Cty.*, No. A06-406, 2006 WL 3773090, at *2-3 (Minn. Ct. App. Dec. 26, 2006) (fired because of sex).

Conversely, here, all that is required to find a violation of the MHRA is that communication was not effective. Needless to say, a public official can engage in ineffective communication without *knowing* that he is engaging in ineffective communication. To say that any public official who engages in ineffective communication necessarily acts with malice would collapse the ineffective-communication inquiry into the deliberate-indifference inquiry and result in public officials being held strictly liable in cases such as this. *See, e.g., Viera v. City of New York*, 15 Civ. 5430 (PGG), 2018 WL 4762257, at *16 (S.D.N.Y. Sept. 30, 2018) (discussing how, in an RA case, the plaintiff "collapsing" the deliberate-indifference inquiry with the effective-communication inquiry, "effectively . . . eliminate[s] the discriminatory intent element and . . . convert[s] the deliberate indifference standard into a strict liability or negligence standard. That is not the law.").

Given that a public official can fail to communicate effectively and yet not realize that he is failing to communicate effectively, the Court doubts that Minnesota courts would refuse to extend official immunity in an ineffective-communication case.

acted with deliberate indifference when he communicated with Catrina about her September 25 arrest; Officer Koch is therefore immune from any MHRA claim related to that conduct.  But the Court has determined that a reasonable jury could find that Officer Koch acted with deliberate indifference in failing to take a domestic-assault complaint from Catrina.  Thus, Officer Koch does not have official immunity from an MHRA claim relating to that failure.

The only remaining issue is whether the official immunity of Sergeant Greene, Sergeant Stanway, and Officer Sherwood—and the partial official immunity of Officer Koch—extend to St. Paul.  "In general, when a public official is found to be immune from suit on a particular issue, his government employer will enjoy vicarious official immunity from a suit arising from the employee's conduct." *Schroeder v. St. Louis Cty.*, 708 N.W.2d 497, 508 (Minn. 2006) (citation omitted).  True, whether to extend vicarious official immunity is "'a policy question for the court,'" but Minnesota courts have almost invariably extended vicarious official immunity to a public entity when one of that entity's employees is entitled to official immunity.  *See AP*, 538 F. Supp. 2d at 1150-51 (citation omitted) (discussing how far Minnesota courts have gone in extending official immunity to public entities).  This Court will follow suit.  Thus, the Court holds that St. Paul is protected by vicarious official immunity from Catrina's

MHRA claim insofar as that claim is based on communication regarding her arrests and Sergeant Green's and Sergeant Stanway's failure to take a statement from her.[40]

## C. Negligence Per Se

Catrina's final claim is that the SPPD's failure to comply with Minn. Stat. § 611.32 constitutes negligence per se. Section 611.32 provides that, "[f]ollowing the apprehension or arrest of a person disabled in communication for an alleged violation of a criminal law, the arresting officer . . . shall immediately make necessary contacts to obtain a qualified interpreter and shall obtain an interpreter at the earliest possible time at the place of detention." Minn. Stat. § 611.32, subd. 2. Section 611.32 further provides that "[a] law enforcement officer shall, with the assistance of the interpreter, explain to the person disabled in communication, all charges filed against the person, and all procedures relating to [their] detainment and release." *Id.* St. Paul argues that—even if

---

[40]At oral argument, Catrina also seemed to argue that—given St. Paul's admission that it is not adhering to the *Bahl* settlement—St. Paul's "lack of a policy" means vicarious official immunity should not be extended to the City. But, as the Court previously noted, St. Paul has a policy, and its policy requires the SPPD to do everything that the SPPD is required to do under the ADA and RA. The fact that St. Paul is not taking the *additional* measures required by the *Bahl* settlement—measures above and beyond what is required by the ADA and RA—is no reason to deprive the City of vicarious official immunity.

this statute was violated[41]—Catrina's claim fails because the statute does not create a private cause of action. The Court agrees.

Whether or not a statute provides a private cause of action is a matter of statutory interpretation. "A statute does not give rise to a civil cause of action unless the language of the statute is explicit or it can be determined by clear implication." *Becker v. Mayo Found.*, 737 N.W.2d 200, 207 (Minn. 2007) (citation omitted). The Minnesota Supreme Court has cautioned that "[p]rinciples of judicial restraint preclude [courts] from creating a new statutory cause of action that does not exist at common law where the legislature has not either by the statute's express terms or by implication provided for civil tort liability." *Bruegger v. Faribault Cty. Sheriff's Dep't*, 497 N.W.2d 260, 262 (Minn. 1993) (citation omitted).

---

[41]St. Paul makes at least two arguments as to why § 611.32 was not violated. One argument is plausible; the other is not.

First, St. Paul argues that Catrina was not a "person disabled in communication" under the statute. St. Paul could be right, given the manner in which Minnesota courts have interpreted this phrase. If a jury were to conclude that the communication regarding Catrina's arrest was effective, then she would not be a "person disabled in communication" for purposes of § 611.32. *See, e.g., State v. Kail*, 760 N.W.2d 16, 21 (Minn. Ct. App. 2009).

Second, St. Paul argues that § 611.32 applies only to arrests based on probable cause, and not to arrests based on warrants. St. Paul has offered no support for this argument, and it is inconsistent with the language of the statute.

Here, the Court does not believe that § 611.32 provides a private cause of action, either explicitly or "by clear implication." Section 611.32 contains no enforcement mechanism,[42] and its stated purposes are to protect "the constitutional rights of persons disabled in communication" and "to provide a procedure for the appointment of interpreters to avoid injustice and to assist persons disabled in communication in their own defense." Minn. Stat. § 611.30. Although "noncompliance with the interpreter statute[] can be relevant in evaluating the validity of a [*Miranda*] waiver," *State v. Farrah*, 735 N.W.2d 336, 342 (Minn. 2007), the Court sees no indication that this prophylactic procedural rule was intended to create a cause of action for money damages. *See State v. Dominguez-Ramirez*, 563 N.W.2d 245, 253 (Minn. 1997) (finding that a violation of § 611.32 did not warrant the suppression of evidence, as the statute did "not create any new constitutional rights"); *see also Bruegger*, 497 N.W.2d at 262 (finding no implied private cause of action under a victim's rights statute that required police officers to inform victims about their right to seek potential reparations).

In what appears to be the only Minnesota appellate decision addressing this issue, the Minnesota Court of Appeals held that § 611.32 was not intended to provide a private cause of action. *Taylor v. Doe*, No. C6-97-996, 1997 WL 729234, at *1 (Minn. Ct. App. Nov. 25, 1997). This Court declines to be the first court to recognize a private

---

[42]St. Paul argues that there are criminal penalties for violations of § 611.32. But those criminal penalties apply to violations of § 611.01, not to violations of § 611.32.

cause of action under § 611.32, particularly in a case in which the alleged violation of the

statute did not deprive the deaf person of any constitutional right or hamper her ability

to defend herself against criminal charges in any way.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.  Defendant's motion for summary judgment [ECF No. 19] is GRANTED IN

    PART and DENIED IN PART.

    a.  The motion is DENIED as to plaintiff's claim that defendant

        violated 42 U.S.C. § 12132, 29 U.S.C. § 794, and Minn. Stat.

        § 363A.12 when Officer Chad Koch failed to take a domestic-

        violence complaint from plaintiff.

    b.  The motion is GRANTED in all other respects, and all of plaintiff's

        other claims are DISMISSED WITH PREJUDICE.

Dated:  August 26, 2019                    s/Patrick J. Schiltz_____
                                           Patrick J. Schiltz
                                           United States District Judge